NO. 12-03-00028-CV
 
IN THE COURT OF APPEALS

TWELFTH COURT OF APPEALS DISTRICT

TYLER, TEXAS
MID-CENTURY INSURANCE COMPANY     §                APPEAL FROM THE THIRD
OF TEXAS AND TEXAS FARMERS
INSURANCE COMPANY,
APPELLANTS
 
V.                                                                         §                JUDICIAL DISTRICT COURT OF


SHEFQET ADEMAJ,
APPELLEE                                                         §                HENDERSON COUNTY, TEXAS
                                                                                                                                                            
OPINION
            In three issues, Appellants Mid-Century Insurance Company of Texas and Texas Farmers
Insurance Company (collectively “MCT”) challenge the trial court’s entry of a partial summary
judgment in favor of Appellee Shefqet Ademaj. We affirm.
 
Background 
The Automobile Theft Prevention Fee
            In 1991, in an effort to combat automobile theft across the state, the Texas Legislature
established the Automobile Theft Prevention Authority (“Authority”) in the Texas Department of
Transportation. Tex. Rev. Civ. Stat. Ann. art. 4413(37), § 2 (Vernon Supp. 2004). In order to fund
the Authority’s programs, the Legislature mandated that each automobile insurer pay to the Authority
“a fee equal to $1 multiplied by the total number of motor vehicle years of insurance for insurance
policies delivered, issued for delivery, or renewed by the insurer.” Tex. Rev. Civ. Stat. Ann. art.
4413(37), § 10(b) (Vernon Supp. 2004).


 The Legislature also added that the $1 fee imposed on the
insurers “is in addition to any other fee or tax imposed by law on an insurer.” Tex. Rev. Civ. Stat.
Ann. art. 4413(37), § 10(c) (Vernon Supp. 2004). By rule, the commissioner of insurance
(“commissioner”) has authorized automobile insurers to recoup this fee from the policyholder. 28
Tex. Admin. Code § 5.205(a) (1992) (Tex. Dept. of Insurance, Automobile Theft Prevention
Authority Pass-Through Fee). The rule also mandates that insurers must include a printed notice on
policies that the fee is charged “in addition to the premium due.” 28 Tex. Admin. Code
§ 5.205(b)(1), (2) (1992). 
The Automobile Insurance Rate-Filing Process
            In that same legislative session, the legislature enacted section 5.101 of the Texas Insurance
Code, entitled “Flexible Rating Program for Personal Automobile Insurance,” which authorized the
commissioner of the Texas Department of Insurance to set a “benchmark rate” for each line of
personal automobile insurance sold in the state of Texas. Tex. Ins. Code Ann. art. 5.101, §§ 1(a),
3(b) (Vernon Supp. 2004). A “rate” is the “charge for a particular line for each unit of exposure.” 
Tex. Ins. Code Ann. art. 5.101, § 2(5) (Vernon Supp. 2004). The “benchmark rate” is defined as
“the rate set annually by the commissioner by line, relative to which the flexibility bands and
statutory rates apply.” Tex. Ins. Code Ann. art. 5.101, § 2(1) (Vernon Supp. 2004). The purpose
of setting the range of benchmark rates on particular lines of automobile insurance is to 1) promote
stability in that line and 2) produce rates that are just, reasonable, adequate, and not excessive for the
risks to which they apply, and not confiscatory. Tex. Ins. Code Ann. art. 5.101, § 3(b) (Vernon
Supp. 2004). In establishing the benchmark rate, the commissioner may give consideration to
 
             1)           past and prospective loss experience within the state and outside the state if the state
data are not credible;
               2)           the peculiar hazards and experience of individual risks, past and prospective, within
and outside the state; 
               3)           a reasonable margin for profit;
               4)           expenses of operation of all insurers, excluding only those expenses that are
disallowed under Subsection (o) of this section;
               5)           the extent and nature of competition in that market;
               6)           the availability or lack of availability in that market;
               7)           the level and range of rates and rate changes among insurers;
               8)           investment and underwriting experience of insurers;
               9)           reinsurance availability;
              10)         consumer complaints;
              11)         extent of denials and restrictions of coverage;
              12)         the volume of cancellations and nonrenewals; and
              13)         any other factor considered appropriate by the commissioner.


Tex. Ins. Code Ann. art. 5.101, § 3(c) (Vernon Supp. 2004). The “flexibility band” is the range of
rates from 30 percent below to 30 percent above, inclusive, the benchmark rates set by the
commissioner by line, within which an insurer, during a set period of time, may increase or decrease
rate levels without prior approval by the commissioner. Tex. Ins. Code Ann. art. 5.101, § 2(3)
(Vernon Supp. 2004). Within 30 days of the effective date of the benchmark rate, each insurer that
proposes to write automobile insurance in Texas must file its proposed rate with the commissioner. 
Tex. Ins. Code Ann. art. 5.101, § 3(e) (Vernon Supp. 2004). Any such filing must produce rates that
are just, reasonable, adequate and not excessive for the risks to which they apply, or the
commissioner shall disapprove the filing. Tex. Ins. Code Ann. art. 5.101, § 3(g) (Vernon Supp.
2004). 
“Permissible Payments”
            Section 21.35B of the insurance code was also enacted in 1991, and it describes the types of
payments that may be solicited or collected by an insurer. It is entitled “Permissible Payments,” and
it mandates that no payment may be solicited or collected by an insurer or agent in connection with
an application for insurance or the issuance of a policy except payments for
 
            1)           premiums;
              2)           taxes;
              3)           finance charges;
              4)           policy fees;
              5)           agent fees;
              6)           service fees, including charges for [local agent service and reimbursement fees];
              7)           inspection fees; or
              8)           membership dues in a sponsoring organization. 


Tex. Ins. Code Ann. art. 21.35B(a) (Vernon Supp. 2004).
 
The Underlying Litigation
            This appeal stems from a class action brought by Ademaj and others in which they sought to
obtain, inter alia, summary judgment on the question of whether MCT could lawfully collect the
Texas Automobile Theft Prevention (“ATP”) fee from its insureds, in addition to the premium
collected from them. In his motion for summary judgment, Ademaj argued that the rate he was
charged for auto insurance was in excess of the legal rate because that fee was not included in the
filed rate under article 5.101 of the Texas Insurance Code. In its motion for summary judgment,
MCT contended that section 21.35B of the insurance code authorized them to charge the ATP fee as
an expense and that they were not required to include the fee as part of their rate-filing with the
commissioner of insurance. 
            On November 14, 2002, the parties jointly filed a motion to sever Ademaj’s claims from the
remaining plaintiffs or, alternatively, to issue a written order for interlocutory appeal of the summary
declaratory judgment. In the motion, Ademaj and MCT stipulated to the following facts:
 
            1.           Ademaj has paid a total of $1.00 to MCT in Auto Theft Prevention Authority fees.
              2.           Ademaj has paid a total of $3.00 to [Texas Farmers Insurance Company] in Auto
Theft Authority Prevention Fees.
              3.           All payments, other than the Auto Theft Prevention Authority fees, that were paid
by Ademaj to MCT and TFIC for private passenger automobile insurance coverage
were legally authorized. 
              4.           The Auto Theft Prevention fee was not charged to Ademaj by MCT or TFIC as part
of the premium for private passenger automobile insurance coverage.
              5.           MCT and TFIC have not included the Auto Theft Prevention fee in their rates, or in
their rate filings made with the Commissioner of Insurance under Tex. Ins. Code art.
5.101 for private passenger auto insurance.


            The joint motion was granted on November 18, and on December 30, the trial court ruled in 
favor of Ademaj on his motion for partial summary judgment. Specifically, the trial court ruled that
1) in order to assess the ATP fee to Ademaj, MCT is required to include the ATP fee in the rate
established under article 5.101 of the Texas Insurance Code, and 2) article 21.35B of the Texas
Insurance Code does not authorize MCT to charge the ATP fee to Ademaj outside the rate established
under article 5.101. 
            MCT now appeals from the trial court’s grant of declaratory relief, raising three issues on
appeal: 1) the ATP fee is a “tax” or “policy fee” and can be recouped under article 21.35B, 2) article
21.35B does not conflict with, and is not preempted by, article 5.101, and 3) article 5.101 does not
provide the sole method for a rate-regulated insurer to collect money in the sale of auto insurance.
 
“Permissible Payments” Versus Regulated Insurance Rates
            In their first issue, MCT contends that the trial court’s final order was erroneous because the
ATP fee is a “tax” or “policy fee” within the purview of article 21.35B. Ademaj argues that the ATP
fee is part of the total amount that MCT must file with the commissioner of insurance in order to
comply with article 5.101. 
Standard of Review
            We review a summary judgment de novo. Vardeman v. Mustang Pipeline Co., 51 S.W.3d
308, 311 (Tex. App.–Tyler 2001, pet. denied). Accordingly, when cross-motions for summary
judgment are filed, we consider the evidence supporting both motions. Cedillo v. Gaitan, 981
S.W.2d 388, 390 (Tex. App.–San Antonio 1998, no pet.). We uphold a traditional summary
judgment only if the summary judgment record establishes there is no genuine issue of material fact
and the movant is entitled to judgment as a matter of law on a ground set forth in the motion. Tex.
R. Civ. P. 166a(c); e.g., Nixon v. Mr. Prop. Mgmt. Co., 690 S.W.2d 546, 548-49 (Tex. 1985). In
deciding whether the summary judgment record establishes the absence of a genuine issue of material
fact, we view as true all evidence favorable to the nonmovant and indulge every reasonable inference,
resolving all doubts in the nonmovant’s favor. Id. Since both parties moved for summary judgment,
this Court has the authority to (1) affirm the judgment, (2) reverse the judgment and render the
judgment that the trial court should have rendered, or (3) reverse the judgment and remand the case
to the trial court for further proceedings. Members Mut. Ins. Co. v. Hermann Hosp., 664 S.W.2d
325, 328 (Tex. 1984).  
            Since we must harmonize the permissible payments provisions in article 21.35B and the rate-filing statutes in article 5.101, we will employ statutory construction principles. Statutory
construction is a question of law, which we review de novo. Bragg v. Edwards Aquifer Auth., 71
S.W.3d 729, 734 (Tex. 2002). When construing a statute, we must try to interpret the statute in a
manner that gives effect to the plain meaning of the statute's words and effectuates the legislature's
intent. Tex. Gov't Code Ann. §§ 312.003, .005 (West 1998); State v. Gonzalez, 82 S.W.3d 322, 327
(Tex. 2002). We are not bound by an agency's interpretation of a statute that it administers or
enforces. Rylander v. Fisher Controls Int'l, Inc., 45 S.W.3d 291, 299 (Tex. App.–Austin 2001, no
pet.). The supreme court has summarized the process and stated that we must look first to the "plain
and common meaning of the statute's words." Fitzgerald v. Advanced Spine Fixation Sys., Inc., 996
S.W.2d 864, 865 (Tex. 1999) (quoting Liberty Mut. Ins. Co. v. Garrison Contractors, Inc., 966
S.W.2d 482, 484 (Tex. 1998)). If a statute's meaning is unambiguous, we generally interpret the
statute according to its plain meaning. Fitzgerald, 996 S.W.2d at 865. Moreover, we determine
legislative intent from the entire act and not just from isolated portions. Jones v. Fowler, 969 S.W.2d
429, 432 (Tex. 1998). Thus, we "read the statute as a whole and interpret it to give effect to every
part." Id. at 432; Gonzalez, 82 S.W.3d at 327. Regardless of whether the statute is ambiguous, we
may consider, among other matters, the object sought to be attained, the circumstances under which
the statute was enacted, the legislative history, the common law or former statutory provisions,
including laws on the same or similar subjects, the consequences of a particular construction, the
administrative construction of the statute, and the title (caption), preamble, and emergency provision. 
Tex. Gov't Code Ann. § 311.023 (West 1998). The legislature's intent is determined by reading the
language used and construing the statute in its entirety. See Cornyn v. Universe Life Ins. Co., 988
S.W.2d 376, 378-79 (Tex. App.–Austin 1999, pet. denied). We read every word as if it were
deliberately chosen and presume that omitted words were excluded purposefully. Id. Our
interpretation must not lead to foolish or absurd results or attribute to the legislature an intent to work
injustice, but if a legislative policy simply seems "unwise or inconsistent with other policies," we may
not depart from "the plain meaning of the legislative mandate." Id.
Analysis
            The Austin Court of Appeals recently addressed this exact issue in Liberty Mut. Ins. Co. v.
Griesing, 2004 WL 1898239 (Tex. App.–Austin 2004, pet. filed).


 In Griesing, the trial court
granted partial summary judgment in favor of Griesing, ordering that Liberty Mutual may not
lawfully impose the ATP fee on Griesing outside of the rates filed and established by insurers under
article 5.101. The trial court also found that the rule promulgated by the commissioner of insurance
allowing insurers to collect the fee was void to the extent that it could be read to permit the collection
of the fee outside the article 5.101 rate. Id. at 1. 
            On appeal, Liberty Mutual argued that summary judgment was improvidently granted because
the ATP fee is a tax, and since article 21.35B authorizes insurers to collect “taxes” from
policyholders as a charge separate from the regulated rate, the collection of the ATP fee was lawful. 
Id. at 2. Griesing countered by arguing that the ATP fee is not a tax, and in any event, article 5.101
creates the only rate that an insurance company can charge a policyholder; therefore, any fees allowed
to be collected under article 21.35B must be included in the article 5.101 regulated rate. Id.
            The statutes discussed by the Austin court are common to both Griesing’s and Ademaj’s
claim, and the court considered articles 5.101 and 21.35B together. Id. at 4. In analyzing these
statutes, the court noted that article 5.101 “creates a highly regulated environment for automobile
insurance with specific goals, factors, and procedures.” Id. The court also noted that when setting
the benchmark rate, reviewing an insurer’s filed rate, and approving or disapproving an insurer’s
application for a rate outside the flexibility band, the commissioner may consider an insurer’s
“expenses of operation” and has wide discretion to disallow “unreasonably incurred expenses.” Id.
            In the context of this regulatory scheme, the court stated that 
 
. . . article 21.35B “acts as a limit on the ability of the commissioner to consider, or of an insurer to
include, the costs of business in establishing a rate.” That is, because an insurer may collect no
payment other than premiums, taxes, finance charges, policy fees, and the other article 21.35B factors,
insurers may only include those costs when filing rates with the commissioner. In addition, although
the commissioner has broad authority to consider factors in addition to those enumerated in section 3(c)
of article 5.101, he may not consider any costs not enumerated in article 21.35B. 


Id. (emphasis in original). When addressing Liberty Mutual’s argument that the “premiums” allowed
to be collected by article 21.35B are equivalent to the article 5.101 rates, the court noted that by
definition, the “rate” is “the charge” for a line of insurance. Id. (emphasis in original). When filing
their rates, insurers must include evidence to show that the calculation of the filed rate does not
include disallowed expenses, and in the context of automobile insurance, disallowed expenses
include all expenses not included in article 21.35B and all those enumerated in section 3(o) of article
5.101, even if those section 3(o) expenses would ordinarily be permitted under article 21.35B. Id. 
Therefore, the court stated, “[w]hen the legislature listed ‘premiums’ as one of several ‘payments’
an insurer could charge, it can only have meant that a premium is a component charge of the ‘rate.’”
Id. 
            The court also disagreed with Liberty Mutual’s argument that the list of allowable charges
in article 21.35B contains only one 5.101 regulated charge (premium) and seven unregulated charges. 
Id. at 5. If Liberty Mutual’s argument was correct, the court stated, then when setting rates, the
commissioner would only be concerned with risk assessment and the appropriate dollar amounts to
adequately cover those risks, or what Liberty Mutual referred to as the “premium.” Liberty Mutual’s
construction of the statutes did not comport with the regulatory intent expressed in the statute,
according to the court, because when setting the benchmark rate, the commissioner is allowed to
consider factors other than risk-assessment (premium), such as a reasonable margin for profit,
expenses of operations, and any other factor he deems appropriate. Id. The court held that those
factors, in addition to the risk-assessment, include the categories of the permissible payments of
article 21.35B. Id.
            To illustrate its holding, the court set forth an example of what would happen under Liberty
Mutual’s interpretation of article 21.35B and article 5.101:
 
As a result, Liberty Mutual’s interpretation would yield unregulated add-ons to the price of a regulated
insurance premium. Consumers would not be protected by the promises of regulation because the
commissioner would not be able to exercise any oversight over an insurer’s “discretionary” addition
of article 21.35B factors to a consumer’s bill. In fact, its interpretation would allow insurers to charge
consumers twice for each of the unregulated factors. An insurer could first make recommendations to
the commissioner for setting the benchmark rate and include those costs in its suggestions. In filing
its actual rates, the insurer would also be able to include those factors. Then, when billing a consumer
the insurer would be able to charge the regulated rate--already based in part on article 21.35B factors
in addition to a reasonable margin for profit and the expenses of operation--and add the article 21.35B
factors onto the regulated rate when generating a policyholder’s total charge. This result would
undermine the regulatory structure the legislature created for automobile insurance. 


Id. Although both parties briefed the issue as to whether the ATP fee is a “tax” under article 21.35B,
the court did not determine that issue. Even if it is a “tax” or any other charge, it must be included
in the rate-filing process because article 21.35B does not create a set of charges immune from the
commissioner’s rate-setting procedures. See id. Instead, the court stated that the payments listed in
article 21.35B act as a limit on the commissioner’s broad discretion to include those factors when
setting or approving rates. Id. The court concluded the opinion by holding that “the rate approved
by the commissioner of insurance under article 5.101 of the insurance code is the only amount that
an automobile insurer may lawfully charge a policyholder” because “[i]n a regulated insurance
industry, consumers may expect that their total charge has been approved by the commissioner.”


 
Id. at 6. 
            The same day it issued its opinion in Griesing, the Austin court addressed the issue of
whether a life insurance company may charge a policy fee in addition to the premium rate set by the
commissioner. Service Life and Cas. Ins. Co. v. Montemayor, 2004 WL 1898226, at *1 (Tex.
App.–Austin 2004, pet. filed). In Montemayor, Service Life sought approval from the commissioner
to charge a $50 policy fee in addition to its premium rate, and the commissioner disapproved the
policy fee. An administrative law judge found that Service Life failed to establish legal authority to
charge the policy fee, and the commissioner signed an order agreeing with the administrative law
judge. Id. The district court affirmed the commissioner’s order.
            On appeal, Service Life argued that article 21.35B allowed it to charge premiums and policy
fees as separate items under the “Act for the Regulation of Credit Life Insurance and Credit Accident
and Health Insurance” (the “Act”).


 Id. at 2. Stated differently, Service Life argued that although
the purpose of the Act is to regulate credit life insurance and health insurance, it may only regulate
premiums, not policy fees. Id. The court then discussed Griesing and similarly concluded that article
21.35B is “not intended to allow insurers to raise revenues by circumventing rate-regulation
requirements.” Id. at 3. 
            We agree with the Austin court’s holding in Griesing that the article 21.35B “permissible
payments” must be considered by the commissioner when establishing rates. First, the commissioner
is charged with setting a benchmark rate that promotes stability and is “just, reasonable, adequate,
and not excessive for the risks to which they apply, and not confiscatory.” Tex. Ins. Code Ann. art.
5.101, § 3(b) (Vernon Supp. 2004). The term “rate” is defined as “the charge for a particular line for
each unit of exposure.” Tex. Ins. Code Ann. art. 5.101, § 2(4) (Vernon Supp. 2004). A rate is 
 
            (1)         excessive if the rate is likely to produce a long-term profit that is unreasonably high
in relation to the insurance coverage provided;
 
              (2)         inadequate if the rate is insufficient to sustain projected losses and expenses to which
the rate applies, and continued use of the rate:
 
(A)endangers the solvency of an insurer using the rate; or
(B)has the effect of substantially lessening competition or creating a monopoly
within any market; or
 
              (3)          unfairly discriminatory if the rate:
 
(A)is not based on sound actuarial principles;
                            (B)         does not bear a reasonable relationship to the expected loss and
expense experience among risks; or
                            (C)         is based wholly or partly on race, creed, color, ethnicity, or
national origin of the policyholder or an insured.


Tex. Ins. Code Ann. art. 5.101, § 3A(b) (Vernon Supp. 2004). 
            In determining what “the charge” for insurance should be, the commissioner may consider, 
inter alia, a reasonable margin for profit, the expenses of operation of all insurers, and the level and
range of rates and rate changes among insurers. Tex. Ins. Code Ann. art. 5.101, § 3(c)(3), (4), (7)
(Vernon Supp. 2004). If an insurer chooses to apply to the commissioner to use its own rating
manual (instead of the rating manual issued by the commissioner) to calculate its rate, the
commissioner must take into account (1) the financial condition of the insurer, (2) the method of
operation and expenses of the insurer, (3) the actual paid and incurred loss experience of the insurer,
(4) investment income of the insurer, and (5) that the contents of the application meet the reasonable
conditions, limitations, and restrictions deemed necessary by the commissioner. Tex. Ins. Code
Ann. art. 5.101, § 3(k), (l) (Vernon Supp. 2004). 
            In order for the commissioner to set a rate that will be fair to the consumer and also not result
in excessive profits or sustained losses to the insurer, some of the factors he may consider pertain to
the financial health of the insurer. By statute, article 21.35B lists the only payments an insurer may
receive from its insured and the only fees an insured will incur from an insurer. Therefore, to
properly set a figure that comprises “the charge” to a consumer for insurance, the commissioner must
give consideration to the article 21.35B payments that insurers receive from their insureds. If those
payments from insureds are not considered in the rate-filing process, then those payments could lead
to charges (rates) to insureds that are “likely to produce a long-term profit that is unreasonably high
in relation to the insurance coverage provided.” See Tex. Ins. Code Ann. art. 5.101, § 3A(b)(1)
(Vernon Supp. 2004). Conversely, when taking all of the article 21.35B payments into account, if
“the charge” to insureds endangers the solvency of that insurer or has the effect of “substantially
lessening competition or creating a monopoly,” then that rate (charge) is inadequate. See Tex. Ins.
Code Ann. art. 5.101, § 3A(b)(2) (Vernon Supp. 2004). Either way, without the article 21.35B
payments from insurers being filed as a part of the rate-filing process, the commissioner cannot
determine the true “charge” of insurance to insureds.


 Therefore, regardless of whether the ATP
charge to insureds is a “tax” or a “fee,” it must be filed with the commissioner during the rate-filing
process. MCT’s issues one, two, and three are overruled. 
 
Conclusion
            MCT admits that it has not included the ATP fee in its filing with the commissioner of
insurance. Without this information, as well as the other article 21.35B payments made by insureds,
the commissioner cannot readily determine a “charge” to insureds that is “just, reasonable, adequate
and not excessive for the risks to which they apply.” The district court did not err by finding that
MCT should have filed this fee as part of the rate-filing process.
            Accordingly, the judgment of the district court is affirmed.
 
                                                                                                    SAM GRIFFITH 
                                                                                                               Justice
Opinion delivered November 24, 2004.
Panel consisted of Worthen, C.J., Griffith, J., and DeVasto, J.
(PUBLISH)